**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CRYSTAL WYATT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 14-cv-3252 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| CAROLYN W. COLVIN, Acting, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Plaintiff's and Defendant's cross motions for summary judgment [27, 29] regarding the Commissioner of Social Security's decision to deny Plaintiff's request for continuing disability benefits. Relevant here is the Administrative Law Judge's determination that Plaintiff's disability ended as of December 31, 2010. Plaintiff asks the Court to reverse the decision of the Administrative Law Judge or to remand for further proceedings; Defendant contends that the Judge should be affirmed. For the reasons that follow, the Court remands for further proceedings consistent with the discussion below.

**I.     Background**

Plaintiff Crystal Wyatt was born on October 1, 1969 and was 41 years old on December 31, 2010. Administrative Record ("A.R.") at 27. Plaintiff previously was approved for disability benefits after being found to be disabled as of December 31, 2001. [27], Pl.'s Mem. at 1. The Social Security Administration determined that Plaintiff's disability ended following medical improvement as of January 2012. *Id.* Plaintiff's request for reconsideration of this determination was denied. *Id.* Plaintiff thereafter requested a hearing and appeared before Administrative Law Judge Roxanne J. Kelsey (the "ALJ") on April 10, 2013. *Id.* The ALJ denied Plaintiff's claim,

and subsequently, the Appeals Council denied her request for review. *Id.* at 1-2. Following that decision, Plaintiff filed suit in this Court, which has jurisdiction under 28 U.S.C. § 405(g).

## II.    Facts

### A.    Relevant Medical Evidence

On October 3, 2002, Plaintiff was deemed disabled; at the time she suffered from several medically determinable impairments, including fibromyalgia, asthma and depression. A.R. at 18-19. As of December 31, 2010, Plaintiff still suffered from fibromyalgia, as well as rheumatoid arthritis, obesity, probable left hip avascular necrosis, sleep apnea, and adjustment disorder. *Id.* at 19. Plaintiff's relevant medical records also contain diagnoses of cervical spondylosis, degenerative disc disease, carpal tunnel syndrome, hypertension, esophageal reflux, hypersomnia, anxiety, Raynaud's disorder[1], dyslipidemia, and lupus. [27], Pl.'s Mem. at 5 (citing A.R.). The records indicate complaints of neck pain, hand pain and numbness, back pain, generalized body pain, sleep disturbances, headaches, fatigue, and abdominal and chest pain. *Id.* (citing A.R.).

Plaintiff's treating rheumatologist, Dr. Daniel Hirsen, submitted an arthritis residual functional capacity questionnaire, dated February 25, 2013. A.R. at 615-17. Dr. Hirsen opined that due to rheumatoid arthritis and avascular necrosis, Plaintiff suffered from several limitations. Specifically, he found that Plaintiff was incapable of tolerating even "low stress" jobs; that she only could walk a quarter of a block with the assistance of a cane or walker; that she could not stand for any length of time; that she could only sit for five minutes at a time; that she needed to walk every five minutes for a two-minute period; that she was incapable of lifting ten pounds;

---

[1] According to the Mayo Clinic, in Raynaud's disease, smaller arteries that supply blood to the skin narrow and limit blood circulation to affected areas. "Raynaud's Disease: Definition," http://www.mayoclinic.org/diseases-conditions/raynauds-disease/basics/definition/con-20022916 (last viewed June 24, 2015). The disease causes some areas of body, including fingers and toes, to feel numb and cold in response to cold temperatures or stress. *Id.*

that she was unable to twist, scoop, crouch, or climb stairs or ladders; and that she had significant limitations in repetitive reaching, handling, and fingering.  *Id.*

Dr. Robert Passovoy, Plaintiff's primary care physician, assessed Plaintiff's fibromyalgia and physical residual functional capacity (or "RFC").  A.R. at 571-73; 612-14.  In the fibromyalgia questionnaire dated July 5, 2012, he opined that due to rheumatoid arthritis, Raynaud's disorder, and carpal tunnel syndrome, Plaintiff could tolerate only low stress jobs; that she could sit for only one hour at a time, stand for ten minutes at a time, and stand or walk for less than two hours during an eight-hour workday; that she required a job that would permit her to shift at will from sitting to walking to standing; and that she would need to take frequent unscheduled breaks during the workday.  *Id.* at 571-73.  He also found that Plaintiff had significant limitations in repetitive reaching, handling, and fingering.  *Id.* at 573.  In the physical RFC questionnaire, dated February 27, 2013, Dr. Passovoy opined that Plaintiff only could walk ten to 15 steps; that she could sit for only 15 minutes and stand for five minutes at one time; that she could stand or walk for less than two hours in an eight-hour workday; that she would need to take very frequent breaks during the workday; that she needed to use a cane to walk or stand; and that she had significant limitations with reaching, handling, and fingering.  *Id.*  at 612-14

A state agency medical consultant, Sandra Bilinsky, also submitted a physical RFC report dated January 24, 2012.  Unlike Drs. Hirsen and Passovoy, Dr. Bilinsky opined that Plaintiff could lift ten pounds, could sit, stand, and walk for about six hours in an eight-hour work day, and that she had no manipulative limitations, including reaching, handling, or fingering.  See A.R. at 551-58.

Finally, a state agency psychological consultant, Leslie Fyans, Ph.D., assessed Plaintiff's mental RFC on January 23, 2012.  Dr. Fyans concluded that Plaintiff's cognitive and attentional

skills for simple one and two-step tasks was intact and that Plaintiff could carry out routine chores and tasks. A.R. at 561. She found that Plaintiff also was able to relate and communicate with others and tolerate work pressures. *Id.* Her report indicates, however, that Plaintiff is "moderately limited" in her ability to understand, remember, and carry out detailed instructions. *Id.* at 559.

**B.      The April 10, 2013 Hearing before the ALJ**

On April 10, 2013, the ALJ held a hearing regarding the denial of disability benefits to Plaintiff following a finding that, as of December 31, 2010, she no longer was disabled. Plaintiff testified at the hearing and was represented by attorney Andrew Barone. A.R. at 17. An impartial vocational expert, Julie Bose, also provided testimony. *Id.*

**1.      Plaintiff's Testimony**

Plaintiff testified that she previously worked as a babysitter, but that she discontinued that work in 2009. A.R. at 755-56. She stated that various health problems have prevented her from working since then. *Id.* at 756. In particular, Plaintiff explained that Raynaud's disorder makes her body sensitive to cold, particularly her hands and feet. *Id.* at 756-57. According to Plaintiff, this sensitivity makes it difficult for her to drive and caused her to miss several appointments, when her son was not available to drive her. *Id.* at 758. Plaintiff also indicated that she has rashes all over her body, which she believes to be caused by lupus. See *id.* at 759.

Plaintiff stated that she has difficulty standing, sitting, and lifting and carrying weight. In particular, Plaintiff testified that lifting and carrying any weight was painful, especially to her joints and hands. She also explained that sitting for a long period of time causes pain, and that she is able to get most comfortable by lying on her left side. *Id.* at 763. Plaintiff reported that she had been prescribed multiple pain medications, including hydrocodone and

hydroxychloroquine.  *Id.* at 768.  Plaintiff further testified that her overall pain level at the time of the hearing was a seven or eight on a ten-point scale.  *Id.* at 762.

The ALJ also asked Plaintiff about her ability to care for her children, perform tasks around the household, and engage in recreational activities.  Plaintiff indicated that her medical conditions have severely impacted and limited all of the above.  Specifically, she stated that she does not perform chores around the house and that she has difficulty opening jars and soda cans due to pain in her hands and arms.  A.R. at 759.  Plaintiff further stated that she is able to write with a pen and paper, but that she needs to take breaks when doing so.  *Id.*  Holding a phone to her ear also is difficult.  *Id.* at 760.  Additionally, although Plaintiff previously spent time with her family playing cards, fishing, bowling and singing karaoke, she no longer engages in such activities, and even when she did in the past, she stated that her participation was limited.  *Id.*  When she goes to the store with her family, she must ride around in a cart and cannot walk normally through the store.  *Id.*  Plaintiff also testified that she has trouble helping her children with their homework, because she has difficulty remembering things.  *Id.* at 761.

Plaintiff further testified that she has been informed that she may need a hip replacement and that she is planning to see an orthopedic surgeon.  A.R. at 771.  Dr. Passovoy advised braces for her wrists, but she was not able to afford them.  *Id.* at 772.  Plaintiff stated that she was taking more than 20 medications at the time of the hearing.  *Id.* at 773-74.

### 2.      The Testimony of the Vocational Expert

Julie Bose, a vocational expert, testified next regarding the availability of jobs based on hypothetical scenarios and combinations of impairments posed by the ALJ.  The ALJ first inquired about available jobs for a hypothetical person who (1) could lift ten pounds occasionally or frequently, (2) could stand or walk for six hours in an eight-hour workday, but could not climb

ladders, ropes, or scaffolds, and (3) could not understand, remember, or carry out detailed instructions, but could sustain the necessary concentration for simple work of a routine and repetitive nature. A.R. at 784-85. Ms. Bose opined that such an individual could perform sedentary and unskilled jobs, such as a document preparer, a telephone quotation clerk, or a circuit board assembler. *Id.* at 785. The ALJ then asked about available jobs for an individual who (1) only could stand or walk for two hours total in an eight-hour workday, (2) needed to take breaks throughout the day on an as needed basis, (3) could not be required to perform fine manipulation with her hands, (4) could use her hands for gross manipulation only ten percent of the workday, and (5) would miss four or more days of work per month. *Id.* at 785-86. Ms. Bose stated that no work existed for such an individual. *Id.*

### C.    The ALJ's Findings

In her written decision, A.R. at 17-28, Judge Kelsey found that Plaintiff had several medically determinable impairments that qualified as severe, including fibromyalgia, rheumatoid arthritis, obesity, probable left hip avascular necrosis, sleep apnea, and adjustment disorder, *id.* at 19. The ALJ also concluded that Plaintiff suffered from several non-severe impairments, including asthma, degenerative disc changes, mild carpal tunnel syndrome, and Raynaud's disorder. *Id.* Despite Plaintiff's assertion that she also suffered from lupus, the ALJ did not find that Plaintiff's alleged lupus qualified as an impairment, based on a lack of formal diagnosis in the record. *Id.* at 20.

The ALJ next determined that since December 31, 2010, Plaintiff did not have an impairment or combination of impairments which met or medically equaled the severity of an impairment described in 20 C.F.R. 404.1525 or 404.1526. A.R. at 20. The ALJ also concluded that there had been a decrease in the medical severity of the impairments previously present

when Plaintiff was found to be disabled in October of 2002. *Id.* at 21. In particular, the ALJ noted Plaintiff's infrequent medical treatment, gaps in treatment, and participation in certain activities that were inconsistent with her disability allegations. *Id.* The ALJ concluded that Plaintiff's improvement was related to her ability to work, as the improvement increased Plaintiff's residual functional capacity. *Id.* at 22. Despite the improvements, Plaintiff continued to have severe impairments, or more than minimal limitations in her ability to perform basic work activities. *Id.* The ALJ concluded that Plaintiff had the residual functional capacity to perform sedentary work as defined by 20 C.F.R. 404.1567(a), except lifting ten pounds. She further opined that Plaintiff could stand, walk, and sit for six hours in an eight-hour workday, but that Plaintiff could never climb ladders, ropes, or scaffolds and could only occasionally climb ramps or stairs, or stoop, kneel, crouch or crawl. *Id.* The ALJ also limited Plaintiff to simple work of a routine and repetitive type. *Id.* Finally, taking into account Plaintiff's lack of past relevant work, her age, education, language skills, and impairments, the ALJ concluded that Plaintiff was able to perform a significant number of jobs in the national economy and thus was not disabled. *Id.* at 27-28.

## III.    Disability Standard

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and related regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). To be found disabled, the claimant's impairment must not only prevent her from doing previous work, but, considering age, education, and work experience, it

also must prevent her from engaging in any other type of substantial gainful work that exists in significant numbers in the national economy. § 423(d)(2)(A).

The Social Security regulations enumerate eight steps to determine whether a claimant continues to be disabled, after previously being found disabled. See 20 C.F.R. 404.1594(f). At step one, the ALJ determines whether the claimant is engaged in substantial gainful activity. *Id.* If so, the claimant is not disabled. *Id.* If not, the ALJ determines at step two whether the claimant has an impairment or combination of impairments that meets or medically equals the severity of an impairment listed in Appendix 1 of 20 C.F.R. 404.1594. *Id.* If so, the disability continues. *Id.* If not, the ALJ determines at step three whether medical improvement has occurred. *Id.* If so, in step four, the ALJ determines whether medical improvement is related to the ability to work. *Id.* If medical improvement is not related to the ability to work, then in step five, the ALJ determines if an exception listed in 20 C.F.R. 404.1594(d) or (e) applies. *Id.* If not, then the disability continues. If at step four, the ALJ determines that medical improvement is related to the ability to work, then in step six, the ALJ determines whether the claimant's current impairments in combination are severe. *Id.* If so, the analysis proceeds to step seven, and the ALJ assesses the claimant's residual functional capacity based on current impairments to determine if the claimant can perform past relevant work. *Id.* If the claimant is not able to perform work done in the past, the ALJ determines whether other work exists that the claimant can perform, in light of the claimant's RFC assessment, age, education, and past work experience. See *id.* If the claimant can perform other work, she no longer is disabled. *Id.* If she cannot, the disability continues. *Id.* To support a finding that the claimant is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates

that other work exists in significant numbers in the national economy that the claimant can perform, given the claimant's unique circumstances. A.R. at 18.

## IV.    Standard of Review

The Social Security Act authorizes judicial review of the final decision of the Social Security Administration and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). A court reviewing the findings of an ALJ thus will reverse the findings of the Commissioner "only if they are not supported by substantial evidence or if they are the result of an error of law." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 40 (1971)). A court reviews the entire administrative record, but does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (citation omitted). In other words, the question upon judicial review is not whether the claimant is, in fact, disabled; even if reasonable minds could differ concerning disability, a reviewing court will affirm so long as the ALJ applied the correct legal standard and substantial evidence supported the decision. See *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

An ALJ must build "an accurate and logical bridge" from the evidence to her conclusion. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (citation omitted)). "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required. *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)). See also *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) ("If

the Commissioner's decision lacks adequate discussion of the issues, it will be remanded."). "Although an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in so doing, he may not ignore entire lines of contrary evidence." *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012).

## V.     Analysis

Plaintiff challenges four aspects of the ALJ's decision, including: (1) the ALJ's evaluation of medical opinions; (2) the ALJ's assessment of residual functional capacity in light of (a) Plaintiff's physical impairments, including obesity, and (b) Plaintiff's mental impairments, including moderate limitations in concentration, persistence, and pace; and (3) the ALJ's determination of Plaintiff's credibility. The Court addresses these issues in turn below.

### A.     Weighing the Opinion Evidence

Plaintiff first argues that the ALJ erred under 20 C.F.R. 404.1527 by rejecting the opinion of her treating rheumatologist Dr. Hirsen in favor of the non-examining state agency physician, Dr. Bilinsky. See Decision, A.R. at 27 ("I afford little weight to the statement submitted by Dr. Hirsen. Again, the extreme limitations are not supported by this doctor's notes and contradict the claimant's normal neurological functioning on examination."). A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. 416.927(c)(2); see *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Accordingly, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion." *Campbell*, 627 F.3d at 306 (quoting 20 C.F.R. 404.1527(d)(2)).

When a treating physician and a non-treating physician have different opinions, "it is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or * * * the consulting physician, who may bring expertise and knowledge of similar cases—subject only to the requirement that the ALJ's decision be supported by substantial evidence." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (quoting *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992)).

Should an ALJ decline to give controlling weight to a treating physician's opinion, she must determine what weight to assign it by considering "the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); see also 20 C.F.R. 404.1527(c)(2). The Seventh Circuit has repeatedly criticized decisions that "said nothing regarding this required checklist of factors." *Larson*, 615 F.3d at 751; *Campbell*, 627 F.3d at 308.

Here, the ALJ gave "little weight" to the opinion of Plaintiff's rheumatologist, and great weight to the opinion of the state agency doctor, without explicitly addressing the factors set forth above. See A.R. at 26-27. With regard to one of the factors—consistency and support— the ALJ wrote that the extreme limitations identified by Dr. Hirsen were not supported by his notes or otherwise contradicted Plaintiff's "normal neurological functioning on examination." *Id.* at 27. The ALJ did not, however, point to any particular inconsistency, explain the relationship between normal neurological functioning and the severity of Plaintiffs' various physical impairments, including rheumatoid arthritis and Raynaud's disorder, or cite to any particular documents in the record that she believed to be inconsistent with Dr. Hirsen's opinion. This terse explanation of the rejection of Dr. Hirsen's RFC assessment does not build "an

accurate and logical bridge" from the evidence to the ALJ's conclusion, *Craft*, 539 F.3d at 673, and effectively prevents meaningful review, *Kastner*, 697 F.3d at 646.

Despite the ALJ's failure to adequately explain her rejection of Dr. Hirsen's assessment, the Seventh Circuit has explained that a case should not be remanded if the same result would be reached on remand. See *McKinzey*, 641 F.3d at 892. The Court accordingly considers the evidence in the record to determine whether substantial evidence supports the rejection of Dr. Hirsen's RFC assessment. As noted, controlling weight is given to a treating source's opinion if well supported and not inconsistent with other substantial evidence in the record.

The Commissioner argues that the ALJ should be upheld because Dr. Hirsen's 2012 treatment notes and radiographic examinations do, in fact, contradict his opinion; in particular, the Commissioners observes that Dr. Hirsen indicated only mild osteopenia in Plaintiff's hands,[2] very mild degenerative changes in her knees, and only minor disc degeneration in her cervical spine. See [30], Def.'s Resp. at 5 (citing A.R. at 575-76; 579-81). These same documents, however, also indicate that Dr. Hirsen believed that Plaintiff suffered from rheumatoid arthritis, fibromyalgia, "widespread specific joint pain, including pain in the anterior hips," potentially avascular necrosis, and Raynaud's disorder, which resulted in her fingers turning white and blue with cold. See Hirsen's Letters to Passovoy, A.R. at 575-76. Further, it is not clear why the presence of certain mild conditions—including osteopenia, degenerative changes, and disc degeneration—would undercut Dr. Hirsen's opinion that Plaintiff nonetheless is severely limited in her ability to stand, sit, walk, carry weight, or use her hands due to other severe

---

[2] Osteopenia is the same condition as osteoporosis—the loss of the mineral part of the bone and the thinning and disintegration of the spongy part of the bone—but to a milder degree. See "Osteoporosis & Other Bone Disorders," Cleveland Clinic, http://my.clevelandclinic.org/services/orthopaedics-rheumatology/diseases-conditions/osteopenia (last viewed June 24, 2015).

impairments—namely rheumatoid arthritis, fibromyalgia, "widespread specific joint pain," avascular necrosis, and Raynaud's disorder.

The Commissioner also notes that 2012 examinations indicate that Plaintiff had no neurological deficit, a normal gait, and normal sensation and coordination; the Commissioner maintains that this evidence too is inconsistent with Dr. Hirsen's opinions. See [30], Def.'s Resp. at 5. The Court disagrees. For one, it is not clear why normal neurological functioning or the lack of a neurological cause of Plaintiff's symptoms would be inconsistent with Dr. Hirsen's opinions; and if the ALJ believed that neurological functioning was relevant to any of Plaintiff's physical conditions or impairments, she failed to explain the basis for that assumption. See *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) ("The fact that Dr. Garg did not find a neurological cause for Moss's condition does not undercut the opinions of Dr. Kodros, whose specialty is the function of the musculoskeletal system, extremities, spine, and associated structures."). In addition, the record that describes Plaintiff as having a normal gait—which could be deemed to be inconsistent with Dr. Hirsen's opinion that Plaintiff could only walk a quarter of a city block—is dated January 12, 2012. See A.R. at 563-64. By contrast, Dr. Hirsen issued his RFC assessment more than a year later, on February 25, 2013, after seeing Plaintiff in October and November of 2012 and in February of 2013. A.R. at 24, 575-76. There is no indication that the ALJ accounted for this significant time gap, during which Plaintiff's walking limitations might have worsened.

Because the ALJ failed to sufficiently explain her consideration of Dr. Hirsen's opinion—the rejection of which does not appear to be supported by the substantial evidence in the record—the Court remands for further proceedings consistent with the foregoing discussion.

## B.    The ALJ's RFC Determination and Plaintiff's Physical Impairments

Plaintiff next contends that the ALJ erred by failing to consider the cumulative effects of Plaintiff's physical impairments, including her obesity, in assessing Plaintiff's RFC and ultimately concluding that Plaintiff is capable of engaging in sedentary work.[3]  See [27], Pl.'s Mem. at 10-14.  Residual functional capacity is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting for eight hours a day, five days a week.  See Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *1 (July 2, 1996).  Plaintiff contends that the ALJ failed to follow Rulings 96-8p and 02-1p in making the RFC determination.  In particular, Ruling 02-1p requires consideration of the limiting effects that obesity may have on one's RFC.  See SSR 02-1p, 2002 WL 34686281, at *6 (Sept. 12, 2002).  "Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling."  *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009).  The Seventh Circuit has instructed ALJs to consider a claimant's conditions and impairment in combination.  *E.g.*, *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005).  In particular, an ALJ must consider how obesity exacerbates other medical issues.  See *id.* at 868 (explaining that a person with disk disease would likely have more pain sitting and standing if she were obese, as compared to a person of normal weight with the same disc disease).  Failure to consider the effect of obesity is grounds for remand.  See *id.*  For the reasons that follow, the Court concludes that the ALJ's decision fails to sufficiently account for Plaintiff's obesity.

Plaintiff suffers from morbid obesity and has a body mass index (or "BMI") of 49.2, based on her height (5'7") and weight (314 pounds).  A.R. at 563.  A person with a BMI of 30 is

---

[3] Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like files, ledgers, and small tools.  20 C.F.R. 404.1567(a).  Sedentary jobs are defined as those that involve sitting, although the regulations recognize that some walking or standing often is necessary to carry out one's job duties.  See *id.*

classified as obese, and if BMI is over 40, as morbidly obese. *Browning v. Colvin*, 766 F.3d 702, 704 (7th Cir. 2014). The Commissioner argues that the ALJ specifically considered Plaintiff's obesity when determining that Plaintiff could perform sedentary work. See [30], Def.'s Resp. at 8 (citing A.R. at 19, 25). In particular, the ALJ's decision states:

> To accommodate the claimant's obesity and pain from her rheumatoid arthritis and fibromyalgia, I have limited the claimant to sedentary work, but lifting a maximum of 10 pounds, no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs and occasional balancing, stooping, kneeling, crouching and crawling. This is supported by the claimant's normal neurological exams, minimal deficit in range of motion, full strength, normal sensation and coordination, her ability to perform tandem walking, heel walking, and toe walking without difficulty and ability to squat and arise with some difficulty. It is also supported by the claimant's infrequent treatment of her conditions.

A.R. at 25. Although it is true that the ALJ *acknowledged* Plaintiff's obesity when determining that she could perform sedentary work, there is no discussion of how Plaintiff's morbid obesity might bear on her ability to sit for long periods of time, as sedentary work requires. See *Browning*, 766 F.3d at 707 ("[Being morbidly obese] might make it difficult * * * to sit for long periods of time, as sedentary work normally requires. * * * the likely difficulties that morbidly obese persons * * * face even in doing sedentary work are sufficiently obvious to have required the administrative law judge to instruct the consulting physician to consider the potential effect of the plaintiff's obesity on her ability to do sedentary work.").

The ALJ's failure to explain how Plaintiff's morbid obesity might affect her ability to perform sedentary work is particularly troublesome in light of Plaintiff's testimony that sitting for any period of time is painful and uncomfortable. In particular, the ALJ asked Plaintiff for how long she is able to sit, and Plaintiff responded:

> Not long, I usually don't sit long, like now the pain – the more I sit the more pain I be in, and I constantly move around, and slide down, you know, trying to get situated but the best is laying on one side, that's the most comfortable I can get is laying on the left side.

A.R. at 763. Because the ALJ failed to sufficiently account for Plaintiff's obesity—or explain her conclusion that Plaintiff can sit for prolonged periods of time, as required by sedentary work, despite her morbid obesity in combination with her other impairments—the Court remands for further proceedings. See, *e.g.*, *Browning*, 766 F.3d at 706-07 (reversing district court and remanding to ALJ where ALJ failed "to consider the bearing of obesity" on claimant's ability to work, where claimant had BMI of 38).

### C.  The ALJ's RFC Determination and Plaintiff's Mental Impairments

Plaintiff next contends that the ALJ erred by failing to properly account for certain limits in her ability to concentrate and carry out instructions. In particular, Leslie Fyans, Ph.D., a state agency psychologist, opined that Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions. See A.R. at 559. Fyans concluded that Plaintiff had the "cognitive and attentional skills for simple one and two steps task[s]." *Id.* at 561. The ALJ agreed with this opinion and found moderate restrictions in concentration, persistence, and pace. *Id.* at 26. The ALJ explained that such findings were consistent with Plaintiff's normal memory and concentration, while accounting for her pain and fatigue. *Id.* The ALJ decided, however, not to limit Plaintiff to one and two-step tasks, purportedly because she believed that "vocational experts find these terms to be poorly defined and respond more accurately when presented with a more precise residual functional capacity." *Id.*

Accordingly, in questioning the vocational expert at the hearing, the ALJ did not use the term "one and two-steps tasks" in the hypotheticals that she presented. Instead the ALJ inquired about jobs that were available to a person "lack[ing] the ability to understand, remember, and carry out detailed instructions but retain[ing] the sustained concentration necessary for simple work of [a] routine and repetitive type." A.R. at 785. Plaintiff argues that the ALJ erred by

failing to adopt the psychologist's opinion that Plaintiff only could perform one and two-step tasks. [27], Pl.'s Mem. at 14-15.

Although the ALJ explained her rejection of the "one and two-step task" limitation proposed by Dr. Fyans for purposes of questioning the vocational expert, the Court agrees with Plaintiff that failing to use the psychologist's terminology with the vocational expert may have caused the expert to overstate the occupations for which Plaintiff qualified. That is, based on the ALJ's hypothetical, the vocational expert testified that Plaintiff would be able to perform work as a document preparer, telephone quotation clerk, or circuit board assembler. According to Plaintiff, on the scale of general education development ("GED") set forth in the Department of Labor's Dictionary of Occupational Titles ("DOT"), these occupations require more sophisticated reasoning abilities than that described in Level One.[4] This is significant because the DOT defines Reasoning Development Level One as the ability to "[a]pply commonsense understanding *to carry out simple one- or two-step instructions*." 1991 WL 688702 at *5 (Jan. 1, 2008) (emphasis added). By contrast, Level 2 requires the application of commonsense understanding to carry out detailed but uninvolved written or oral instructions, and Level 3 involves carrying out instructions furnished in written, oral, or diagrammatic form and dealing with problems involving several concrete variables. *Id.* at *4. "Although the Seventh Circuit has not addressed the issue, several courts * * * have concluded that a limitation to one- to two-step tasks is consistent with GED Reasoning Development Level 1 * * * as the language of the RFC limitation mirrors the language of Level 1." *Wiszowaty v. Astrue*, 861 F. Supp. 2d 924, 947 (N.D. Ind. 2012). Given that the state agency psychologist (which the ALJ credited) appeared to limit Plaintiff to one and two-step tasks, it is not clear from the record that Plaintiff would in fact

---

[4] Plaintiff states, and the Commissioner does not dispute, that the DOT assigns a Reasoning Development Level of 3 to the document preparer and telephone quotation clerk occupations, and a Reasoning Development Level of 2 to the circuit board assembler occupation. [27], Pl.'s Mem. at 15.

be able to perform occupations requiring reasoning skills above the first reasoning development level.

Plaintiff also argues that the ALJ should have included in her hypotheticals to the vocation expert the ALJ's finding that Plaintiff's persistence and pace are moderately restricted, see A.R. at 26. As noted, the hypothetical posed by the ALJ included the inability to handle detailed instructions and the ability to sustain the concentration necessary for simple work of a routine and repetitive type. A.R. at 785. Plaintiff argues that under *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010), the ALJ was required to account for Plaintiff's persistence and pace limitations and explain their effect on Plaintiff's ability to work. See [27], Pl.'s Mem. at 16. The Court agrees.

In *O'Connor-Spinner*, the Seventh Circuit explained that in most cases, "the ALJ should refer expressly to limitations on concentration, persistence and pace in the hypothetical [posed to a vocational expert] in order to focus the [expert's] attention on these limitations[.]" 627 F.3d at 620-21. This is necessary to "orient the [expert] to the totality of a claimant's limitations," which include any "deficiencies of concentration, persistence and pace." *Id.* at 619. Exceptions to this general rule apply where the expert has independently reviewed the medical records or has heard testimony that directly addresses those limitations. *Id.* The exception does not apply in this case, however, because the ALJ elicited the vocational expert's opinion by posing hypotheticals; accordingly, the Court "infer[s] that the [expert's] attention [was] focused on the hypotheticals and not on the record," *id.* Moreover, there is no indication that the vocational expert reviewed Plaintiff's medical records or psychological evaluations; rather, it appears that the expert looked only at the records concerning Plaintiff's prior work and vocational history. See A.R. at 781. Finally, *O'Connor-Spinner* indicates that the ALJ's inclusion of some, but not

all, of Plaintiff's limitations—namely, that Plaintiff "lacks the ability to understand, remember, and carry out detailed instructions but retains the sustained concentration necessary for simple work of routine and repetitive type," A.R. at 785—likely is not sufficient to account for the ALJ's finding that Plaintiff has moderate persistence, pace, and concentration limitations. See 627 F.3d at 620 ("[E]mploying terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the [vocational expert's] consideration those positions that present significant problems of concentration, persistence and pace.").

For all of these reasons, the Court remands for further proceedings consistent with the foregoing discussion.

### D.     The ALJ's Credibility Determination

Finally, Plaintiff argues that the ALJ erred in her assessment of Plaintiff's credibility at the hearing. In particular, the ALJ determined that Plaintiff's allegations regarding her inability to perform any chores, memory problems, sensitivity to cold, and difficulty using her hands were not supported, or were contradicted, by the record. See A.R. at 26. Under Ruling 96-7p, in determining the credibility of a claimant's statements, the ALJ "must consider the entire case record," provide "specific reasons for the finding on credibility, supported by the evidence in the case record," and must "be sufficiently specific to make clear to the individual and to any subsequent reviewers the * * * reasons for [the] weight" given to the claimant's allegations. SSR 96-7p, 1996 WL 374186, at *1-2 (July 2, 1996). See also Terry, 580 F.3d at 477 (the ALJ must "justify the credibility finding with specific reasons supported by the record"). The Court gives "considerable deference" to an ALJ's credibility finding and only overturns it if "patently wrong." *Id.*

Plaintiff first argues that the ALJ erred by making an adverse credibility finding based on a purported gap in Plaintiff's medical treatment. [27], Pl.'s Mem. at 18. Plaintiff contends that this error requires remand, because the ALJ should have posed specific questions to her about the cause for the perceived gaps. Although Plaintiff is correct that "an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference," *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012), in this case there is no indication that the ALJ relied on gaps in treatment in determining the credibility of Plaintiff's testimony. The ALJ cited a number of reasons for at least partially discounting Plaintiff's testimony—including what Plaintiff reported to her therapist, memory tests, omissions in her medical records, and evaluations contained in medical records—but none involve gaps in treatment. See A.R. at 26. The ALJ did make reference to a nine-month period in which Plaintiff did not see a doctor, see A.R. at 24, but that observation was made as part of the ALJ's discussion of the medical evidence, not in her discussion of Plaintiff's testimony, or her credibility, specifically.

Plaintiff relatedly argues that the ALJ failed to sufficiently support her credibility determination with evidence that the ALJ believed was inconsistent with Plaintiff's testimony. In particular, Plaintiff takes issue with the following "boilerplate" from the ALJ's decision: "[T]he claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the RFC assessment for the reasons explained below." A.R. at 23. Plaintiff contends that this "boilerplate" statement prevents the Court from knowing whether the ALJ determined credibility in the first instance, as required, or, whether the ALJ first made the RFC assessment and subsequently found any conflicting testimony by Plaintiff to be inconsistent with that assessment. See [27], Pl.'s Mem. at 19. The Court disagrees.

Although Plaintiff is correct that an ALJ may not use mere boilerplate language to support a credibility determination, see *Bjornson v. Astrue*, 671 F.3d 640, 644-46 (7th Cir. 2012), the use of "boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if [she] otherwise points to information that justifies [her] credibility determination," *Pepper v. Colvin*, 712 F.3d 351, 367-68 (7th Cir. 2013). Here, as the Commissioner points out, the ALJ cited to several documents in the record that she found to be inconsistent with Plaintiff's testimony. See A.R. at 26 (citing therapist's notes, medical records, doctor's notes, and internal medicine consultative examination results).

The Court notes, however, that there are several other pieces of evidence in the record that *do* support or might explain some of the testimony by Plaintiff that the ALJ discounted. For example, the ALJ did not credit Plaintiff's alleged difficulty using her hands, based on certain tests in the record that indicated that Plaintiff had normal grip strength and no deficit in fine or gross manipulations. See A.R. at 26 (citing 01/12/12 Internal Medicine Consultative Examination). The ALJ failed to discuss other evidence in the record, however—such as Dr. Hirsen's November and October 2012 letters to Dr. Passavoy noting that Plaintiff suffers from mild osteopenia and Raynaud's disorder—which could support Plaintiff's testimony regarding her hands. See A.R. at 623-24. In addressing Plaintiff's credibility on remand, the ALJ should "consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists, and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." SSR 96-7p, 1996 WL 347186, at *1.

## VI.    Conclusion

For all of the reasons set forth above, the Court grants Plaintiff's motion in part [27], denies Defendant's motion [29], and remands for additional proceedings consistent with this opinion.

Dated:  June 24, 2015

_____
Robert M. Dow, Jr.
United States District Judge